**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

RUFINO PERALTA-SANCHEZ,
*Defendant-Appellant*.

Nos. 14-50393
14-50394

D.C. No.
3:12-cr-03370-LAB-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted May 4, 2016
Pasadena, California

Filed February 7, 2017

Before: Harry Pregerson, Jay S. Bybee,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Pregerson

## SUMMARY[*]

### Criminal Law

The panel affirmed a conviction and sentence for illegal entry, and the revocation of supervised release, in a case in which the defendant argued that his expedited removal was fundamentally unfair, and cannot serve as the basis of the illegal reentry count, because he was neither entitled to hire counsel nor advised of his right to apply for withdrawal of his application for admission.

The panel held that the defendant had no Fifth Amendment due process right to hire counsel in the expedited removal proceeding under 8 U.S.C. § 1225, and that he cannot demonstrate prejudice from the failure to notify him of the right to withdraw his application for admission under 8 U.S.C. § 1225(a)(4). As a result, the panel concluded that the defendant's 2012 expedited removal could be used as a predicate for his illegal reentry conviction, and affirmed the denial of the defendant's motion to dismiss the indictment and the subsequent judgment and sentence as well as the revocation of his supervised release.

Dissenting, Judge Pregerson would hold that there is a due process right to counsel during expedited removal proceedings.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Kara Hartzler (argued), San Diego, California, for Defendant-Appellant.

Michelle L. Wasserman (argued), San Diego, California, for Plaintiff-Appellee.

## OPINION

BYBEE, Circuit Judge:

Rufino Peralta-Sanchez (Peralta) was convicted of illegal entry in violation of 8 U.S.C. § 1325 and illegal reentry in violation of 8 U.S.C. § 1326. The predicate for his illegal reentry count was his expedited removal in 2012. Peralta argues that his expedited removal was fundamentally unfair and thus cannot serve as the basis of the illegal reentry count, because he was neither entitled to hire counsel nor advised of his right to apply for withdrawal of his application for admission. We find that Peralta had no Fifth Amendment due process right to hire counsel[1] in the expedited removal proceeding and that he was not prejudiced by the government's failure to inform him of the possibility of withdrawal relief. Concluding that his 2012 expedited removal was not fundamentally unfair, we affirm his § 1326 conviction and sentence for illegal reentry. Because the revocation of his supervised release was premised on the

---

[1] When we refer to the "right to counsel" in this case, we mean the right of an alien to hire counsel at no expense to the government. We do not refer to a right to *government-appointed* counsel.

§ 1326 conviction, we affirm the district court's revocation as well.

## I.  FACTS AND PROCEEDINGS

A.  *The Facts*

On March 7, 2014, at approximately 11:20 p.m., video surveillance along the U.S.-Mexico border spotted two individuals hiding in the brush about one mile north of the border.  U.S. Border Patrol agents spent four to five hours tracking fresh footprints, which ultimately led the agents to Rufino Peralta-Sanchez and his companion, who were by that time approximately six miles from the border.  A Border Patrol agent conducted a field interview, during which Peralta admitted to being a Mexican citizen without documents permitting him to enter or remain in the United States.  The agents gave Peralta a *Miranda* warning, and Peralta agreed to talk and to waive his right to counsel.  In a post-arrest interview, he stated that he was a citizen of Mexico; had no documents allowing him to enter or remain in the United States; had entered the United States illegally on March 7, 2014; had been previously deported from the United States; and had crossed the border from Mexico in order to travel to Fresno, California.  Peralta was eventually charged with one count of improper entry by an alien, 8 U.S.C. § 1325, and one count of being a removed alien found in the United States, 8 U.S.C. § 1326.  At the time of his arrest, he was still on supervised release for his most recent felony conviction for reentering the United States illegally.

Peralta first entered the United States in 1979 at the age of twenty.  He obtained legal status in 1986 and became a lawful permanent resident (LPR) in December 1990.

Between 1990 and 2000, he maintained a relationship with a woman with whom he has three U.S. citizen children. Peralta's criminal history, including a history of immigration offenses, is extensive. In 1982, Peralta was arrested in Bakersfield, California, under the name Gabriel Sanchez for arson, although these charges were eventually dismissed. He was arrested in 1983 under the same name, again for arson. In 1990, he was arrested in Fresno under the name Rufino Peralta-Sanchez for giving a false identification to a peace officer. Between 1990 and 1996, Peralta collected a string of driving under the influence (DUI) convictions: five misdemeanor convictions and a 1996 felony DUI conviction for which he was sentenced to 16 months in prison. As a result of the 1996 felony DUI conviction, the then-Immigration and Naturalization Service (INS) issued Peralta a Notice to Appear, charging him as removable for having been convicted of an aggravated felony "crime of violence." Peralta was ordered removed on June 7, 1999.

Peralta returned regularly to the United States. In January 2000, he was again convicted of felony DUI, as well as possession of cocaine, for which he was sentenced to 28 months in prison. Following this conviction, Peralta was convicted of misdemeanor illegal reentry. After serving his sentence, Peralta's 1999 removal order was reinstated in December 2001, and he was again removed from the United States. Undeterred, Peralta entered the United States again and was convicted of felony reentry in October 2002, for which he received 30 months in prison. After serving this sentence, his 1999 order of removal was again reinstated in July 2004, and he was again removed from the United States. After another illegal reentry, the 1999 deportation order was again reinstated on May 23, 2012, and Peralta was again removed. Three days later, Peralta was again apprehended by

Border Patrol agents one mile north of the border, hiding in the brush with two others.[2]  He immediately admitted to being a Mexican citizen with no legal documents to enter the United States and, in a post-arrest interview, admitted that he had entered the United States by walking through the desert with the intent to travel to Los Angeles to find work.  On July 17, 2012, Peralta was charged with and convicted of misdemeanor illegal reentry and sentenced to time served. He was ordered removed via expedited removal proceeding and removed on July 18.  On July 22, Peralta returned again, was arrested, and in November 2012, was convicted of felony illegal reentry and sentenced to 21 months in prison.  He was removed on January 30, 2014, and returned on March 7, 2014, bringing us back to this case, which arises out of Peralta's arrest on March 8, 2014.[3]

B.  *The Proceedings*

As a result of his March 2014 arrest, Peralta was charged with improper entry into the United States under 8 U.S.C. § 1325 (count one) and with being a removed alien found in the United States in violation of 8 U.S.C. § 1326 (count two). Peralta moved to dismiss count two, arguing that his underlying 1999 and 2012 removal orders violated due process.  Peralta argued that his original 1999 removal was invalid because felony DUI is no longer considered a crime

---

[2] This incident is not to be confused with the March 2014 incident, which is the subject of this case and which follows a very similar pattern.

[3] In sum, from what we can tell from the record, Peralta has at least eight felony arrests (1982, 1983, 1990, 1996, 2000, 2002 (2), and 2014) and five misdemeanor DUI convictions, and he has been removed from the United States at least four times (1999, 2001, 2004, and 2012).

of violence.[4]  He also argued that his July 2012 expedited removal was invalid because he was deprived of his purported due process rights to counsel in an expedited removal proceeding and to be informed of his right to seek withdrawal of his application for admission to the United States.

The district court initially rejected Peralta's argument regarding his 1999 removal and denied the motion to dismiss count two of the indictment.  It found that Peralta had suffered no due process violation, and that if he had, he suffered no prejudice because he did not qualify for any discretionary relief.  Peralta was convicted on both counts of the indictment following a bench trial.  He then filed a motion to reconsider the dismissal of count two.  The district court denied the motion.  However, in light of our then-recent decision in *United States v. Aguilera-Rios*, 754 F.3d 1105 (9th Cir. 2014), *as amended*, 769 F.3d 626, in which we held that intervening higher authority should be retroactively applied in determining whether an alien was deportable as charged, the district court concluded that *Aguilera-Rios* called into question the validity of the 1999 removal order. Nevertheless, the district court denied the motion to dismiss because Peralta's 2012 expedited removal was valid.  Peralta was sentenced to 24 months in prison on the § 1325 charge and 30 months in prison on the § 1326 charge, to run concurrently.  He was also sentenced to 10 months in prison,

---

[4] At the time, the Board of Immigration Appeals (BIA) considered felony DUI a "crime of violence" requiring an alien's removal under 8 U.S.C. § 1101(a)(43)(F).  Felony DUI is no longer considered an aggravated felony crime of violence.  *See Leocal v. Ashcroft*, 543 U.S. 1 (2004); *United States v. Trinidad-Aquino*, 259 F.3d 1140 (9th Cir. 2001).

to run consecutively, for violating the conditions of his supervised release from his November 2012 conviction.

On appeal, Peralta challenges the validity of both the 1999 and 2012 removal orders. We examine only the 2012 expedited removal, as this was the removal order on which the district court ultimately relied in sustaining Peralta's § 1326 conviction. We have jurisdiction under 18 U.S.C. § 3231.

## II.  STATUTORY AND CONSTITUTIONAL FRAMEWORK

A. *Expedited Removal and Illegal Reentry*

1.  Expedited Removal

Expedited removal proceedings under 8 U.S.C. § 1225 are limited to aliens arriving in the United States, "whether or not at a designated port of arrival"; and aliens "who ha[ve] not been admitted or paroled into the United States" and cannot show that they have been continuously present in the United States for two years "immediately prior to the date of determination of inadmissibility."  8 U.S.C. § 1225(a)(1), (b)(1)(A)(iii)(II); 8 C.F.R. § 235.3(b)(1)(ii).[5]  Section 1225 gives the Secretary of Homeland Security[6] "sole and

---

[5] Expedited removal proceedings under § 1225 are not to be confused with expedited removal proceedings under § 1228, which deals with the removal of aggravated felons.

[6] Section 1225 provides that the discretion rests with the Attorney General.  The Homeland Security Act of 2002 designated the Secretary of Homeland Security in place of the Attorney General. 6 U.S.C. §§ 251(2), 252(a)(3), 271(b), 552(d), 557; *see Clark v. Martinez*, 543 U.S. 371, 374

unreviewable discretion" to designate which, if any, aliens described in the latter category—those arriving in the United States who have not been admitted or paroled into the United States and have not been continuously present for the last two years—will be subject to expedited removal.  8 U.S.C. § 1225(b)(1)(A)(iii)(I).  By order, the Secretary of Homeland Security has determined to use the expedited removal procedure for those aliens (1) "who are physically present in the U.S. without having been admitted or paroled," (2) who are found "within 100 air miles of the U.S. international land border," and (3) who cannot establish that they have been physically present in the United States for the immediately preceding fourteen days.  Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01, 48880 (Aug. 11, 2004).

If an immigration officer, after conducting an inspection, determines that such an alien does not possess valid entry documents, has presented fraudulent documents, or has made a false claim of U.S. citizenship, "the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution."  8 U.S.C. § 1225(b)(1)(A)(i); *see also id.* § 1182(a)(6)(C), (a)(7). When making a finding of inadmissibility, the officer must create a record of the facts and statements made by the alien, read the statement containing these facts to the alien, explain the charges against the alien, and give the alien a chance to respond to the charges in a sworn statement.  8 C.F.R. § 235.3(b)(2)(i).  In short, the alien is provided with notice of the charges against him or her and given an opportunity to

n.1 (2005) (noting that the immigration authorities previously exercised by the Attorney General and INS now reside with the Secretary of Homeland Security).

respond.  In contrast to the statutes governing formal removal proceedings under § 1229a or the removal of aggravated felons under § 1228, the statutes and regulations governing expedited removal proceedings do not provide that the alien may be represented by counsel.

Except in a limited category of cases (not applicable here), an alien who is determined to be inadmissible via § 1225 proceedings is not entitled to administrative or judicial appeal.  The Attorney General, however, has discretion to grant withdrawal of the alien's application for admission. 8 U.S.C. § 1225(a)(4); *see also id.* § 1225(b)(1)(C) (noting that an alien who claims to be an LPR, a refugee, or an asylee may be entitled to appeal).  If the Attorney General permits an alien to withdraw his application for admission, the alien must "depart immediately from the United States."  *Id.* § 1225(a)(4).

2.   Illegal Reentry

Section 1326 punishes an alien who has been "denied admission, excluded, deported, or removed" and later "enters, attempts to enter, or is at any time found in, the United States" without permission.  8 U.S.C. § 1326(a)(1), (2); *see United States v. Barajas-Alvarado*, 655 F.3d 1077, 1079 (9th Cir. 2011).  Although an alien has no right to appeal an expedited removal order, "[a] defendant charged under § 1326 has a due process right 'to collaterally attack his removal order because the removal order serves as a predicate element of his conviction.'"  *United States v. Raya-Vaca*, 771 F.3d 1195, 1201 (9th Cir. 2014) (quoting *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1047 (9th Cir. 2004)). In order to challenge a criminal charge under § 1326, a defendant must show that:   (1) he has exhausted

administrative remedies for seeking relief from the underlying order of removal; (2) the deportation proceedings "improperly deprived" him of the opportunity for judicial review; and (3) the removal order was "fundamentally unfair." 8 U.S.C. § 1326(d); *Raya-Vaca*, 771 F.3d at 1201–02.[7] To show that a removal order was fundamentally unfair, the defendant must demonstrate that the proceeding violated his due process rights and that he suffered prejudice as a result of that violation. *Raya-Vaca*, 771 F.3d at 1202.

Where a motion to dismiss a § 1326 charge is based on an alleged due process violation in the underlying removal proceeding, we review the denial of the motion to dismiss de novo. *United States v. Camacho-Lopez*, 450 F.3d 928, 929 (9th Cir. 2006). We review the district court's findings of fact for clear error. *Id.*

B. *Rights Under the Due Process Clause*

Aliens who "enter" the United States are entitled to *some* measure of due process under the Due Process Clauses of the Fifth and Fourteenth Amendments before the government acts to deprive them of life, liberty, or property. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful,

---

[7] We note first that, because § 1225(b) provides for no administrative or judicial review of an expedited removal order, Peralta had no administrative remedies to exhaust and has been deprived of judicial review. The government concedes that Peralta therefore satisfies the first two requirements for challenging his § 1326 conviction. *See Raya-Vaca*, 771 F.3d at 1202. We therefore need address only the "fundamentally unfair" prong, i.e., whether Peralta suffered a due process violation and was prejudiced as a result.

unlawful, temporary, or permanent."); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976).  Here, there does not appear to be any dispute that Peralta effected entry into the United States prior to his 2012 expedited removal when he crossed the border free from "official restraint."**[8]**  We will therefore assume that Peralta is an alien to whom the Due Process Clause applies.

We have held that an alien facing deportation faces the loss of a liberty interest.  An alien, like Peralta, has a right to removal proceedings that conform to the requirements of due process.  *See Raya-Vaca*, 771 F.3d at 1203 & n.6; *Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1161 (9th Cir. 2004).  However, the fact that aliens are protected by the Due Process Clause does not mean that "all aliens are entitled to enjoy all the advantages of citizenship or . . . that all aliens must be placed in a single homogenous legal classification." *Mathews*, 426 U.S. at 78.  "[T]he class of aliens is itself a heterogenous multitude of persons with a wide-ranging variety of ties to this country."  *Id.* at 78–79.

\* \* \*

---

**[8]** In contrast, aliens who attempt to enter at an official port-of-entry and are detained by immigration officials have not "entered" the United States, even if they may be physically present in U.S. territory, because they have not crossed the border "free from official restraint."  This is sometimes referred to as the "entry fiction."  *United States v. Argueta-Rosales*, 819 F.3d 1149, 1162–68 (9th Cir. 2016) (Bybee, J., dissenting) (discussing the history of the official restraint doctrine); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 213–15 (1953) (referring to this "legal fiction"); *United States v. Parga-Rosas*, 238 F.3d 1209, 1213 (9th Cir. 2001).

The question we must ask in this case is: To *what* process—statutory and constitutional—was Peralta entitled?

## III.  PERALTA'S CLAIMS

Due process requires, at a minimum, notice and an opportunity to respond. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). The regulations governing expedited removal proceedings require an alien to be given notice and an opportunity to respond to the charge of inadmissibility. 8 C.F.R. § 235.3(b)(2)(i). Peralta does not dispute that the government complied with these regulations. He argues, however, that because he was caught a mile inside the U.S. border—as opposed to being arrested at an official port of entry—he is entitled to more than just notice and an opportunity to respond. As we have noted previously, "[a]liens who have entered the country are thus distinct from aliens at a port of entry, over whom Congress has plenary power and for whom the process prescribed by Congress constitutes due process." *Raya-Vaca*, 771 F.3d at 1203 n.5 (citation omitted). Peralta argues that he suffered two due process violations: first, that he was not advised of his right to obtain counsel; and second, that he was not notified that he might be entitled to withdraw his application for admission to the United States. We address each argument in turn.

## A.  *Right to Obtain Counsel*

"The right to counsel in immigration proceedings is rooted in the Due Process Clause . . . ." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005). "Although there is no Sixth Amendment right to counsel in an immigration hearing, Congress has recognized it among the rights stemming from the Fifth Amendment guarantee of due process that adhere to

individuals that are the subject of removal proceedings." *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004). We have never addressed, however, whether due process requires that an alien be offered the opportunity to secure counsel in the context of an expedited removal under § 1225.[9]

There are two questions to be answered on this issue. The first is whether Peralta had a *statutory* right to counsel at no expense to the government. If so, due process may require that he be notified of that right, as we have held in other cases in which the applicable statute or regulation provided that the alien may be represented by counsel. *See, e.g.*, *United States v. Reyes-Bonilla*, 671 F.3d 1036, 1045–46 (9th Cir. 2012) (finding that an alien was denied due process where he was not properly advised of his statutory right to counsel in a § 1228 proceeding). If Peralta has no statutory right, then the second question is whether the Due Process Clause of the Fifth Amendment independently gives Peralta the right to obtain counsel at no expense to the government.

1.  Statutory right to counsel

Congress has provided that aliens may be represented by counsel in certain proceedings. For example, 8 U.S.C. § 1362 provides that "[i]n any removal proceedings before an

---

[9] In *Barajas-Alvarado*, we concluded that Barajas-Alvarado's "claim that he was denied his right to counsel is meritless on its face." *Barajas-Alvarado*, 655 F.3d at 1088. The defendant in that case, though, never entered the United States. *Id.* Here, Peralta's argument depends on the distinction between aliens who have not entered the United States and are entitled only to whatever process Congress has chosen to provide, *see United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950), and aliens who have entered the United States and therefore may be entitled to something more.

immigration judge . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."  Similarly, § 1228, which governs expedited removal of aggravated felons, and § 1229a, which governs formal removal proceedings, provide that an alien has the right to representation at no expense to the government. *See* 8 U.S.C. §§ 1228(b)(4)(B), 1229a(b)(4)(A). None of these provisions applies to Peralta.  "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration in original) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).  Consistent with this rule of construction, the federal regulations governing removal proceedings provide that "[e]xcept in the case of an alien subject to the expedited removal provisions of section 235(b)(1)(A) of the Act [, located at 8 U.S.C. § 1225(b)(1)(A),]" an alien must be provided with notice of the right to be represented at no expense to the government. 8 C.F.R. § 287.3; *see Barajas-Alvarado*, 655 F.3d at 1088 (noting that expedited removal proceedings do not provide a right to counsel).  Peralta will have to look elsewhere for a statutory right to counsel.

Peralta argues that he has a general right to be represented by counsel of his choice under the Administrative Procedure Act (APA).  Section 555 of the APA provides that "[a] person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative" and that "[a] party

is entitled to appear in person or by or with counsel or other qualified representative in an agency proceeding."  5 U.S.C. § 555(b).  Peralta has not referred us to any law or case indicating that this provision extends the right to counsel to immigration proceedings.

This failure is not surprising because the Supreme Court has long held that deportation proceedings are not governed by the APA.  *See Ardestani v. INS*, 502 U.S. 129, 133 (1991); *Marcello v. Bonds*, 349 U.S. 302, 310 (1955).  In *Wong Yang Sung v. McGrath*, 339 U.S. 33, 53 (1950), the Court held that the APA applied to deportation proceedings conducted under the Immigration Act of 1917.  In *Marcello*, the Court revisited its decision in *Wong Yang Sung* in light of the new Immigration and Nationality Act of 1952.  *Marcello*, 349 U.S. at 306–07.  The *Marcello* Court concluded, however, that the procedures set up by the Immigration and Nationality Act (INA) superseded the procedures provided for by the APA.  *Id.* at 308–10.  The Court wrote that "it is clear that Congress was setting up a specialized administrative procedure applicable to deportation hearings, drawing liberally on the analogous provisions of the Administrative Procedure Act and adapting them to the particular needs of the deportation process."  *Id.* at 308. Congress used the APA "only as a model, and when . . . there was a departure from the Administrative Procedure Act—based on novel features in the deportation process—surely it was the intention of the Congress to have the deviation apply and not the general model."  *Id.* at 309. The Court reaffirmed *Marcello* in *Ardestani*, noting that

> *Marcello* does not hold simply that deportation proceedings are subject to the APA except for specific deviations sanctioned

> by the INA.  Rather, *Marcello* rests in large part on the statute's prescription that the INA "shall be the *sole* and *exclusive* procedure for determining the deportability of an alien under this section."

*Ardestani*, 502 U.S. at 134 (emphases in original) (quoting Immigration and Naturalization Act of 1952 § 242(b) (codified as amended at 8 U.S.C. § 1229a(a)(3))).

Peralta points out that the Supreme Court has applied the APA to the BIA.  *See, e.g.*, *Judulang v. Holder*, 132 S. Ct. 476, 483–84 (2011).  But *Judulang* did nothing more than apply the "analytic framework" of the judicial review provisions—the "standard 'arbitrary [or] capricious' review"—of § 706 of the APA.  *See id.* at 483 n.7 (alteration in original).  This is in no way inconsistent with the Court's approach in *Marcello* and *Ardestani*.  "[Section] 706 of the APA functions as a default judicial review standard." *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000); *see Bowen v. Massachusetts*, 487 U.S. 879, 903–04 (1988); *Abbott Labs. v. Gardner*, 387 U.S. 136, 140–41 (1967).  There is nothing novel here: Congress displaced the adjudicatory provisions of the APA with the INA; by contrast, it left the judicial review provisions of the APA in place, and the BIA's actions are subject to those review provisions.

We conclude that these proceedings are governed by the INA, and in this case, 8 U.S.C. § 1225 specifically.  Peralta has no statutory right to obtain counsel in an expedited proceeding.

2.   Due process right to counsel

Because he has no statutory right to obtain counsel in an expedited proceeding, Peralta asks us to find that he has a constitutional right to do so.  In this context, Peralta is asking us to find the INA unconstitutional because § 1225 does not provide an alien a right to counsel and, as we noted in the prior section in this context, we must presume the omission is deliberate.  Thus, Peralta has a due process right to obtain counsel only if we are persuaded that Congress was wrong to omit it from the adjudicative scheme it created.  "Judging the constitutionality of an Act of Congress is properly considered 'the gravest and most delicate duty that [a court] is called upon to perform . . . .'"  *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 319 (1985) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981)).    "[D]eference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment."  *Id.* at 319–20.  This deference is particularly powerful in the area of immigration and naturalization because "the power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."  *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909))).

The constitutional sufficiency of the procedures Congress provided in expedited removal proceedings under the INA is determined by application of the balancing test articulated in

*Mathews v. Eldridge*, 424 U.S. 319 (1976). Under *Mathews*, we analyze existing procedures and additional proposed procedures based on: (1) the nature of the private interest at stake; (2) the risk of erroneous deprivation of that interest through the existing procedures, as well as the value of the proposed safeguard; and (3) the government's interest, including the additional financial or administrative burden the proposed procedure would impose. *Id.* at 335. We note that "the fundamental fairness of a particular procedure does not turn on the result obtained in any individual case; rather, 'procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions.'" *Walters*, 473 U.S. at 321 (quoting *Mathews*, 424 U.S. at 344).

      a.   Nature of the private interest at stake

The Supreme Court has recognized that deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." *Bridges v. Wixon*, 326 U.S. 135, 154 (1945). We have added that "[t]he high stakes of a removal proceeding and the maze of immigration rules and regulations make evident the necessity of the right to counsel." *Biwot*, 403 F.3d at 1098. These statements, however, were made in the context of formal removal proceedings before an immigration judge, proceedings for aliens who had been present in the United States for some period of time longer than a few minutes or hours. We do not appear to have ever specifically considered the interest at stake for an alien facing expedited removal under § 1225.

Unlike other types of removal proceedings, proceedings under § 1225 apply only to "arriving aliens" and aliens found

in the United States who have no valid entry documents and cannot establish that they have been here for at least fourteen days. *See* 8 C.F.R. §§ 1.2, 235.3(b)(1); 69 Fed. Reg. at 48880. These proceedings are essentially *exclusion* proceedings, even if they can in some instances be applied to aliens who may have technically effected entry into the United States—like Peralta—because the alien crossed the border at somewhere other than a designated port-of-entry and did so free of "official restraint." The provision targets aliens who have either no residence here or only a limited residence. Such an alien's interest in remaining in the United States is therefore much more limited than that of an alien already living here who has been placed in formal removal proceedings and stands to lose, perhaps, formal legal status here, and certainly the life he or she has created here.[10]

Indeed, had Peralta attempted to enter at a designated port-of-entry, he would have had *no* interest in remaining in the United States, and would be entitled to *no* process but that which Congress has chosen to give him in § 1225. *See Shaughnessy*, 338 U.S. at 544; *United States v. Sanchez-Aguilar*, 719 F.3d 1108, 1112 (9th Cir. 2013); *Barajas-Alvarado*, 655 F.3d at 1084, 1088; *Pazcoguin v. Radcliffe*, 292 F.3d 1209, 1218 (9th Cir. 2002). We cannot think that Peralta's interest—or that of any alien covered by § 1225—is

---

[10] The dissent claims that the fact that Peralta had moved to the United States in 1979 shows that expedited removal proceedings target more than just people with no or a limited residence in the United States. Dissent at 37–38. But this overlooks the fact that Peralta was first removed from the United States in 2000 and has not legally resided here since then. And in his initial removal proceedings, Peralta was afforded the full ambit of due process protections that he desires here. With this in mind, any ties that Peralta has to the United States have already been taken into account and severed.

substantially greater than that of an alien denied admission at a port-of-entry and placed in the very same expedited removal proceedings simply because Peralta managed to evade the Border Patrol until he was several miles inside the United States. To hold otherwise would create perverse incentives for aliens attempting to enter the United States to further circumvent our immigration laws by avoiding designated ports-of-entry.

We conclude that an alien subject to expedited removal proceedings under § 1225 has only a limited interest at stake, and a much less significant interest than those subject to removal proceedings under §§ 1228 and 1229a.

> b.  Risk of erroneous deprivation

We likewise conclude that risk of error in the context of § 1225 removal proceedings is low, and that enabling an alien

to retain counsel would not improve the accuracy of the proceedings. We recognize that expedited removal proceedings permit no judicial or administrative review, which we assume would decrease any risk of error. In this case, however, the class of aliens to which expedited removal applies is fairly narrow, and the analysis required to determine whether an alien may be subject to expedited removal proceedings is straightforward: the immigration officer need determine only whether an alien has valid documents to enter or remain in the United States. *See* 8 U.S.C. § 1225(b)(1). This is a relatively simple exercise. We note as well that aliens who would otherwise be subject to expedited removal, but who seek asylum or who claim a fear of persecution, or claim to have LPR status, are entitled to further process under § 1225 before removal proceedings can

take place. *Id.* § 1225(b)(1)(A)(i); 8 C.F.R. § 1235.3(b)(4), (5). Peralta points to no evidence suggesting that aliens are being wrongfully removed via expedited removal proceedings because of a lack of additional process, including a right to counsel.[11]

It is therefore unclear what added value counsel could provide in expedited removal proceedings. In contrast, formal removal proceedings, as we have already noted, are very much akin to a trial, involving various different stages and potentially complex procedural matters in which the assistance of counsel could be invaluable in helping an alien navigate the process. Expedited removal proceedings, by design, involve none of these complications, and the principal inquiry is a simple factual one. We are concerned that requiring more process would fundamentally alter Congress's scheme without adding any significant protection for aliens in expedited removal proceedings.

---

[11] The dissent, nonetheless, went beyond the record and found a study indicating that protection for those who seek asylum or claim fear of persecution are sometimes erroneously denied. Dissent at 39 n.14, 40. These risks were not raised by any party below, were not briefed, and were not mentioned at oral argument. We are unwilling to credit a twelve-year-old study without the benefits of our adversarial system to challenge its validity, methodology, or significance to the case at hand.

The dissent also raises the possibility that some individuals may be incompetent due to mental illness or disability. Dissent at 41. This point too was not raised below, was not briefed, and was not mentioned at oral argument. Even taking these highly particularized risks into account, and ignoring their procedural and substantive flaws, would not tip the *Mathews* factors in Peralta's favor. *See Walters*, 473 U.S. at 321 ("[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." (quoting *Mathews*, 424 U.S. at 344)).

Peralta argues, however, that counsel could help an alien subject to expedited removal proceedings obtain withdrawal relief. *See* 8 U.S.C. § 1225(a)(4). Withdrawal relief, though, implies that the alien unlawfully entered or attempted to enter the United States, meaning that the alien was properly subject to expedited removal proceedings in the first place. In other words, withdrawal relief simply provides an alternative avenue of removal. *See id.* This argument does not prove that counsel would be of assistance in preventing an alien from being wrongfully placed in expedited removal proceedings or wrongfully removed as a result.

Peralta also argues that counsel could provide assistance in cases like his, where a subsequent change in the law calls into question a previous order of removal. In 1999, Peralta was ordered removed because he had a felony DUI and, under BIA decisions, was considered an aggravated felon, a status that we and the Supreme Court later reversed. *Leocal v. Ashcroft*, 543 U.S. 1, 13 (2004); *United States v. Trinidad-Aquino*, 259 F.3d 1140, 1146–47 (9th Cir. 2001). We recognize that Peralta lost his LPR status as a result of this removal proceeding and that this indirectly led to his expedited removal in 2012. But allowing Peralta to obtain counsel at an expedited removal hearing would not have prevented any "erroneous deprivation" of his rights in the sense that *Mathews v. Eldridge* contemplates. Any "error" in Peralta's 1999 removal order was the result of a broad policy that was successfully challenged in the courts. Even if Peralta had known that his 1999 order was erroneously obtained, Peralta had no right to enter the United States in 2012, so securing counsel in 2012 would not have aided

him.**¹²**  *Cf. Maness v. Meyers*, 419 U.S. 449, 458 (1975) (explaining that persons who "refuse to obey [a court] order generally risk criminal contempt even if the order is ultimately ruled incorrect").  If Peralta thought that his 1999 removal order was illegal, his remedy was not to sneak back across the border, but to seek to reopen the removal order from outside the United States.  *See Coyt v. Holder*, 593 F.3d 902, 907 (9th Cir. 2010) ("[P]hysical removal of a petitioner by the United States does not preclude the petitioner from pursuing a motion to reopen [immigration proceedings].").**¹³**  In a similar context, we determined that reinstatement of a previous removal order did not violate due process where the alien was not entitled to have the validity of the reinstated order reviewed by an immigration judge:

> While aliens have a right to fair procedures, they have no constitutional right to force the government to re-adjudicate a final removal order by unlawfully reentering the country. . . .  If [an alien] has a legitimate basis for challenging his prior removal order, he will be able to pursue it after he leaves the

---

**¹²** Peralta's 1999 removal order followed issuance of a notice to appear and a hearing before an immigration judge.  The IJ advised Peralta that he could secure counsel at his own expense and continued the case so Peralta could do so.  Peralta did not obtain counsel.

**¹³** We note that Peralta has given no explanation as to why, in the thirteen years between his initial 1999 removal and his 2012 expedited removal, he never sought the assistance of counsel, which he now so earnestly claims could have made a difference in his immigration status. Instead, Peralta chose to reenter the United States illegally, not once, but *six different times*.

country, just like every other alien in his position.

*Moralez-Izquierdo v. Gonzales*, 486 F.3d 484, 498 (9th Cir. 2007).

We conclude that the risk of wrongful removal under § 1225 is quite low, and that providing additional safeguards in the form of counsel would not significantly improve the existing process, particularly when weighed against the cost, which we discuss below.

c. Government's interest

Peralta argues that, "[g]iven that the Government is not being asked to foot the bill, its vehement opposition to a right to counsel in expedited removal is baffling, as well as unreasonable." We think Peralta underestimates the burden a right to counsel would place on the government in this context. Although the government would not have to pay an alien's attorney's fees, Peralta has not taken into account the costs to the government that would result from the inevitable delay if an alien is entitled to seek counsel. The government would have to detain the alien perhaps for days or weeks longer, while the alien is given "reasonable" time to seek representation, as we have required in cases in which there is a statutory right to counsel in removal proceedings, and which we would presumably require here. *See Biwot*, 403 F.3d at 1098–99 (citing *Rios-Berrios v. INS*, 776 F.2d 859, 862–63 (9th Cir. 1985)). If the alien is entitled to counsel, the government will, in turn, want to provide its own counsel—as it does in removal proceedings under §§ 1229a and 1228. "[L]awyers, by training and disposition, are advocates and bound by professional duty to present all

available evidence and arguments in support of their clients' positions and to contest with vigor all adverse evidence and views." *Walters*, 473 U.S. at 324 (quoting *Gagnon v. Scarpelli*, 411 U.S. 778, 787–88 (1973)). The presence of the lawyers will inevitably complicate the proceedings. As Judge Friendly put it, "Within the limits of professional propriety, causing delay and sowing confusion not only are [a lawyer's] right but may be his duty." Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1288 (1975).

The expedited removal process is intended to allow the government to exclude quickly those aliens found at or near the border who are clearly inadmissible—those who have no legal entry documents and who have established only a limited presence here. The introduction of lawyers in the expedited removal process is likely to turn the proceeding into something more akin to a trial—and a trial not before an IJ, but before an immigration officer unqualified to weigh the competing demands of opposing counsel in what will become an adversary proceeding. This will prolong the decisionmaking process, exponentially increasing the cost to the government as the government must detain the alien, pay for the government's own representation, pay for the creation of a longer record, and pay for the increased time the immigration officer must spend adjudicating such cases, distracting the officer from any other duties. Such a process, as Judge Friendly recognized in a slightly different context, is "not formulated for a situation in which many thousands of hearings must be provided each month." *Id.* at 1290.

In short, the introduction of counsel risks destroying the "expedited" removal process.[14] It is in no way "baffling" that the government so vehemently objects to this. We are also deeply concerned with the "new and wholly unwarranted incentive" this is likely to create "for aliens who have previously been removed to reenter the country illegally in order to take advantage of this self-help remedy. It would also make a mockery of aliens who do respect our laws and wait patiently outside our borders seeking lawful admission." *Moralez-Izquierdo*, 486 F.3d at 498.

* * *

In light of the limited benefit a right to counsel is likely to provide in this context, and in light of the *significant* cost the government would likely incur, we refuse to sanction this kind of self-help, and the wholesale circumvention of our immigration laws, by finding that aliens who illegally enter the United States and are subject to expedited removal proceedings under §1225 are constitutionally entitled to counsel. "Nothing in the Constitution requires such a perverse result." *Moralez-Izquierdo*, 486 F.3d at 498.

---

[14] The dissent, in a one-paragraph dismissal of the government's interest, claims that the cost of providing an attorney "does not appear to be prohibitive" because the government allows representation in *other* types of expedited removal proceedings. Dissent at 42 (citing 8 U.S.C. § 1228(b)(4)(B)). But the government's allowance of representation in dissimilar proceedings does not mean that the costs of representation in those proceedings, let alone in the proceedings before us, are not significant. It just means that the government has chosen to bear those costs for people in that situation. We have no basis for imposing real costs on the government simply because Congress has made the choice to assume such costs in other situations.

In sum, Peralta suffered no due process violation when he was denied counsel in his expedited removal hearing.  His interests in securing counsel are limited, the government's interest in having expedited proceedings is high, and we find there is relatively little risk of error in such proceedings.

B.  *Right to Be Informed of Withdrawal*

Peralta also argues that he was denied due process because he was not informed of the possibility of withdrawal relief under § 1225(a)(4).  That section states:  "An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw his application for admission and depart immediately from the United States."  8 U.S.C. § 1225(a)(4).  "In the context of removal proceedings for aliens who have already been admitted into the United States, we have held that due process requires the immigration judge to inform such aliens of potentially available avenues of relief."  *Sanchez-Aguilar*, 719 F.3d at 1112 (citing *United States v. Arce-Hernandez*, 163 F.3d 559, 563 (9th Cir. 1998)); *see also Barajas-Alvarado*, 655 F.3d at 1084 ("[T]he Supreme Court has ruled that when Congress enacts a procedure, aliens are entitled to it.").  By contrast, "[n]on-admitted aliens . . . who seek entry at the border 'are entitled only to whatever process Congress provides.'"  *Sanchez-Aguilar*, 719 F.3d at 1112 (quoting *Barajas-Alvarado*, 655 F.3d at 1088).  Neither § 1225, nor the corresponding regulations governing expedited removal, require an immigration officer to advise an alien of the opportunity to request withdrawal relief, and we have held that "[a]s a result, the immigration officer's failure to inform [an alien] of his ability to request withdrawal of his application for admission [does] not violate his due process rights."  *Id.*

*Sanchez-Aguilar* dealt with an alien who was detained at a port-of-entry, not one in Peralta's position who crossed the border elsewhere and managed to effect brief entry into the United States before he was caught by Border Patrol. Thus, the same confusion we noted above, about the extent to which an alien in Peralta's position—one who has effected technical entry into the United States, but who has not been admitted—is entitled to due process, applies here. We need not answer the due process question in this case, however. Even assuming that Peralta had a due process right to notice of the possibility of withdrawal relief, Peralta cannot demonstrate prejudice.

In order to establish that he was prejudiced by the government's failure to notify him of withdrawal relief, Peralta must "make a 'plausible' showing that the facts presented would cause the Attorney General to exercise discretion in his favor." *Barajas-Alvarado*, 655 F.3d at 1089 (quoting *Arce-Hernandez*, 163 F.3d at 563). "Plausibility" requires more than a mere showing of possibility, however. The Customs and Border Patrol has created an Inspector's Field Manual which lays out six factors that should be used to guide the granting of the Attorney General's withdrawal relief. These factors are: (1) the seriousness of the immigration violation; (2) previous findings of inadmissibility against the alien; (3) intent on the part of the alien to violate the law; (4) the ability to easily overcome the ground of inadmissibility; (5) age or poor health of the alien; and (6) other humanitarian or public interest considerations. Customs & Border Patrol, *Inspector's Field Manual* § 17.2 (2006); *see also Barajas-Alvarado*, 655 F.3d at 1090.

As to the first factor, the seriousness of the immigration violation, Peralta argues that his violation was not "serious"

because he did not present fraudulent documents to attempt to gain entry to the United States. The use of fraudulent documents, however, appears to operate as an automatic disqualifier; this does not mean that the non-use of fraudulent documents renders repeated immigration violations non-serious. *See Inspector's Field Manual* § 17.2(a); *see also United States v. Garcia-Gonzalez*, 791 F.3d 1175, 1179 (9th Cir. 2015); *Barajas-Alvarado*, 655 F.3d at 1091. Indeed, we find Peralta's consistent inability to abide by our immigration laws, despite several periods of imprisonment as a result of these violations, to be serious, and to demonstrate a clear intent to violate the law. We are not sympathetic to Peralta's argument that he violated the law merely to "remedy the unlawful deportation that the Government had perpetrated on him years before." There is no evidence that Peralta entered the United States in order to correct any errors in his prior immigration proceedings; he had other, lawful avenues available to him that did not involve further violations of our immigration laws. Thus, the first and third factors clearly weigh against him. *See Raya-Vaca*, 771 F.3d at 1208 (finding that "a history of illegal reentries" made the defendant's most recent violation "relatively serious"); *Barajas-Alvarado*, 655 F.3d at 1090 (finding that the fact the defendant was subject to two previous expedited removal rendered the most recent violation "serious").

We find as well that the second and fourth factors, related to inadmissibility, similarly weigh against Peralta. He argues that his only prior finding of inadmissibility was the 1999 removal order, based on case law at the time that has now changed, and that his U.S. citizen children could have sought adjustment of status on his behalf in 2012. First, we note that his 1999 removal order was reinstated three times, which means that he had four findings of inadmissibility. We have

stated before that, even where a prior finding of inadmissibility may years later be rendered incorrect by a change in the law, this does not affect its finality for immigration purposes. *See Raya-Vaca*, 771 F.3d at 1208 (noting that the defendant's prior finding of inadmissibility "cut against" his claim that withdrawal relief was plausible, even if it had "due process concerns" in light of subsequent changes in the law); *Aguilera-Rios*, 769 F.3d at 633 n.3 ("[A] determination by this Court on collateral review that a noncitizen's conviction was not for a federal aggravated felony offense would not affect the finality of the prior removal." (citing 8 C.F.R. § 1003.23(b)(1))).

Second, we note that Peralta could not have sought adjustment of status, and was therefore unlikely to overcome the previous findings of inadmissibility.[15]  Adjustment of status is available only to aliens who are "inspected and admitted or paroled into the United States," 8 U.S.C. § 1255(a), which Peralta had not been.  An alien must also be admissible at the time he seeks adjustment of status, *see id.*, and Peralta was inadmissible at the time for at least two reasons:  he had no valid entry documents, *see id.* § 1182(a)(7), and he had been convicted for felony possession of a controlled substance, *see id.* § 1182(a)(2)(A)(i)(II); *see also, e.g.*, *Garcia-Gonzalez*, 791 F.3d at 1179 (finding that the fourth factor weighed against an alien and noting that the defendant's state-law conviction for possession of cocaine

---

[15] Despite Peralta's claim that he could have applied for adjustment of status based on his relationship to his adult U.S. citizen children, we note that no application for adjustment of status was pending on Peralta's behalf at the time, nor, to our, knowledge, has one ever been filed on Peralta's behalf by any qualifying relative since his original removal in 1999.

rendered him inadmissible and therefore ineligible for adjustment of status). Thus, the second and fourth factors weigh against Peralta.

As to the fifth factor, age and poor health, Peralta was fifty-three years old at the time of his expedited removal in 2012. Despite now claiming that he "suffered many years of back-breaking labor in the fields," and that this somehow tilts the fifth factor in his favor, Peralta told the Border Patrol agent who took him into custody in 2012 that he was, in fact, in good health. He also told the agent that he was planning to travel to Los Angeles to seek work. Indeed, Peralta was certainly well enough to walk through the desert to enter the United States, and to hide in the brush to evade Border Patrol. In short, there is nothing in the record to suggest that Peralta was in ill health at the time of his expedited removal. This factor weighs against him as well.

Finally, we address factor six, humanitarian considerations. On this point, Peralta principally emphasizes his long residence in the United States prior to his 1999 removal and the fact that he has three U.S. citizen children. However, in *Barajas-Alvarado*, we concluded that an alien's "ties to the United States" are "not listed as considerations in the Inspector's Field Manual and therefore carry little weight." 655 F.3d at 1091. From the record, Peralta's family ties are also somewhat unclear. In his most recent arrest, in 2014, Peralta claimed that he was attempting to travel to Fresno to see his family, but in 2012, he told Border Patrol that he wanted to travel to Los Angeles to work, making no mention of his family. Beyond the fact of its existence, there is little mention of Peralta's family or his involvement with it in the record, and as we noted above, there is nothing to indicate that Peralta's children had or have attempted to file

an application for adjustment of status on his behalf. Hence, these facts do not appear to weigh in Peralta's favor. Even assuming that this factor *did* weigh in Peralta's favor, this would not be enough to outweigh every other factor against him.

Because the majority of the Inspector's Field Manual factors weigh against withdrawal relief, Peralta cannot show that it was "plausible" that he would have been granted this relief. Accordingly, he cannot show that he was prejudiced by the immigration officer's failure to notify him of the possibility of withdrawal.

## IV.  CONCLUSION

In sum, we conclude that Peralta's 2012 expedited removal was not fundamentally unfair. Peralta had no Fifth Amendment due process right to counsel in the expedited removal proceeding under § 1225, and he cannot demonstrate prejudice resulting from the failure to notify him of the right to withdraw his application for admission. As a result, his 2012 expedited removal could be used as a predicate for his § 1326 conviction. We therefore affirm the district court's denial of Peralta's motion to dismiss the indictment and his subsequent judgment and sentence, as well as the revocation of his supervised release.

**AFFIRMED.**

PREGERSON, Circuit Judge, dissenting:

I dissent.  I would hold that there is a due process right to counsel during expedited removal proceedings.[1]

## I.   Expedited Removal

Expedited removal—the process in which a noncitizen is removed from the country without a formal removal proceeding—was established in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).[2]  The expedited removal process begins and ends with a Customs and Border Protection (CBP) officer.  There is no right to appear in front of a judge and no right to hire legal representation.  There is no hearing, no neutral decision-maker, no evidentiary findings, and no right to appeal.  For

---

[1] In this case, the right to counsel means the right to hire a lawyer at no cost to the government.

[2] Expedited removal under 8 U.S.C. § 1225 (not to be confused with expedited removal under 8 U.S.C. § 1228, which applies to persons convicted of aggravated felonies) applies to two types of noncitizens: (1) arriving noncitizens, except for citizens of Cuba arriving by plane; and (2) noncitizens who arrive in, attempt to enter, or have entered the U.S. without having been admitted or paroled at a port-of-entry and who have not established to the satisfaction of a Customs and Border Protection officer that they have been physically present in the U.S. continuously for the two-year period immediately prior to the date of determination of inadmissibility.  8 U.S.C. § 1225(a)(1), (b)(1)(A)(iii)(II); 8 C.F.R. § 235.3(b)(1)(ii).

these reasons, human rights advocates have criticized expedited removal as a violation of human rights.[3]

Hundreds of thousands of people are expeditiously removed from this country each year. In 2013, the Department of Homeland Security removed approximately 438,000 noncitizens from the U.S.[4] Expedited removals comprised 44% of all removals.[5] An additional 39% of removals were conducted through Reinstatement of Removal, another fast track procedure established by IIRIRA with similarly nonexistent procedural safeguards.[6] That means that 363,540 people—a staggering 83% of the people removed from the U.S. in 2013—were removed without a hearing, without a judge, without legal representation, and without the opportunity to apply for most forms of relief from removal.

It is apparent that the expedited removal system is flawed in many ways. The chance to consult with a lawyer, which is the subject of this appeal, is just one way to make the process fair. I would find that such a due process right is mandated under the Constitution.

---

[3] *See, e.g.*, ACLU Foundation, *American Exile: Rapid Deportations That Bypass the Courtroom* (Dec. 2014), available at https://www.aclu.org/files/assets/120214-expeditedremoval_0.pdf

[4] John F. Simanski, Dep't of Homeland Sec. Office of Immigration Statistics, *Annual Report: Immigration Enforcement Actions: 2013* 1 (Sept. 2014), available at http://www.dhs.gov/sites/default/files/publications/ois_enforcement_ar_2013.pdf.

[5] *Id*.

[6] *Id*.

## II.  The *Mathews v. Eldridge* test weighs in favor of a right to counsel.

The three-part test from *Mathews* is used to determine whether an individual has received due process under the Constitution.**[7]**  Under *Mathews*, we balance:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.**[8]**

The majority concludes that the *Matthews* test weighs against establishing a right to counsel in expedited removal proceedings because Peralta-Sanchez's interest in securing counsel is limited, the government's interest in having expedited proceedings is high, and there is relatively little risk of error in such proceedings.  Maj. Op. 27.

I disagree.  On balance, the *Mathews* test weighs in favor of finding a right to counsel in expedited removal proceedings.

---

**[7]** Noncitizens found within the U.S. are entitled to due process under the Fifth Amendment.  *United States v. Raya-Vaca*, 771 F.3d 1195, 1203 & n.5 (9th Cir. 2014).

**[8]** *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

### a.  Private interest at stake

The private interest at stake here is significant.  An individual subject to expedited removal, like Peralta-Sanchez, "stands to lose the right to stay and live and work in this land of freedom [and] . . . the right to rejoin h[is] immediate family, a right that ranks high among the interests of the individual."[9]  Upon removal, noncitizens, like Peralta-Sanchez, may not return to the U.S. for the next five years, sometimes longer, regardless of whether they later seek entry with proper documentation.[10]  Allowing CBP officers to render a judgment with such harsh consequences without a hearing and a neutral decision-maker violates the fundamental values of our society.

The majority believes that the interest at stake is more limited because the expedited removal statute targets noncitizens who have no residence or only a limited residence in this country.  Maj. Op. 19–21.  Though the statute may have been designed to target individuals with limited or no residence in this country, this is not reality for many individuals subject to expedited removal.[11]

---

[9] *Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (internal quotation marks and citations omitted); *see also Walters v. Reno*, 145 F.3d 1032, 1043 (9th Cir. 1998).

[10] 8 U.S.C. § 1182(a)(9)(A)(i).

[11] Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877-01, 48880 (Aug. 11, 2004) (subjecting to expedited removal noncitizens who are found within 100 miles of the border and who cannot establish that they have been physically present in the U.S. for the preceding 14 days).

Expedited removal allows CBP officers to designate thousands of noncitizens who have lived in, worked in, and contributed to our country for many years to be removed without basic procedural safeguards. These are people who have close ties in the U.S to their families, their spouses, their children and grandchildren. Peralta-Sanchez, for example, moved to the U.S. in 1979 at the age of twenty. For decades, he lived and worked in the United States. His three adult children are U.S. citizens by birth. Like so many others, Peralta-Sanchez's strong ties to our country did not protect him from expedited removal.

The majority argues that allowing individuals to hire counsel in expedited removal proceedings just because they were apprehended after crossing into the U.S. (as opposed to before entering the U.S.) would create "perverse incentives . . . to further circumvent our immigration laws by avoiding designated ports-of-entry." Maj. Op. 21. But the perverse incentive argument overlooks the fact that most people come to our country seeking to better their lives and the lives of their families—*that* is the incentive to reach U.S. soil, not the ability to hire a lawyer in a removal proceeding.

Providing greater procedural safeguards in expedited removal proceedings would not create any additional incentives to enter the country than those that already exist.

### b. Erroneous deprivation

Prior to IIRIRA, any individual who sought entry into the U.S. without proper documentation or who violated the terms of his entry visa could present his case to an immigration judge. This allowed for plenary proceedings and the opportunity to be represented by a lawyer. The IIRIRA

stripped away almost all of the procedural safeguards then in place.

Now, the deportation process can begin and end with a CBP officer untrained in the law. Once a CBP officer determines that an individual is inadmissible, the officer will order immediate removal unless the individual expresses a fear of persecution, an intent to apply for asylum, or claims a legal right to reside in the U.S. based on citizenship, permanent residence, asylum, or refugee status.[12] There is no hearing, no neutral decision-maker, no evidentiary findings, and no opportunity for administrative or judicial review.[13] This lack of procedural safeguards in expedited removal proceedings creates a substantial risk that noncitizens subjected to expedited removal will suffer an erroneous removal.

Those who are at an obviously higher risk of erroneous deprivation are individuals who claim asylum or who are mentally incompetent.[14] If a person declares to a CBP officer that he fears returning to his country of origin, he is entitled to an interview with an asylum officer to determine whether

---

[12] 8 U.S.C. § 1225(b)(1)(A)(ii), (b)(1)(C); 8 C.F.R. § 235.3(b)(5).

[13] 8 U.S.C. § 1225(b)(1); 8 C.F.R. § 235.3.

[14] *See* Emily Puhl, *Prosecuting the Persecuted: How Operation Streamline and Expedited Removal Violate Article 31 of the Convention on the Status of Refugees and 1967 Protocol*, 25 Berkeley La Raza L.J. 87 (2015); Aimee L. Mayer-Salins, *Fast-Track to Injustice: Rapidly Deporting the Mentally Ill*, 14 Cardozo Pub. L. Pol'y & Ethics J. 545 (2016).

his fear is credible and legitimate under asylum law.[15] However, researchers have shown that CBP officers often do not respond to claims for asylum and fail to refer some bona fide asylum seekers to an appropriate asylum officer. In one study, researchers found that 15% of individuals who expressed a fear of returning to their country of origin were removed without being afforded the opportunity to participate in a credible fear interview.[16]

The study also uncovered alarming instances of CBP officers failing to provide even the minimal safeguards available in expedited removals: (1) CBP officers did not read the obligatory paragraph informing noncitizens that U.S. law provides protection to certain persons who face persecution; (2) CBP officers did not specifically inquire about the noncitizen's fear of returning to his or her country; (3) CBP officers refused interpreters; (4) CBP officers used aggressive or hostile interview techniques, including sarcasm, ridicule, verbal threats, and accusations; and (5) CBP officers told noncitizens to sign documents with little or no explanation of what they were signing or what the implications might be, and in most cases these documents were written in a language the noncitizens were not able to read.[17]

---

[15] 8 C.F.R. § 235.3(b)(4); 8 C.F.R. § 208.30.

[16] Allen Keller, M.D. *et al.*, Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States, Report on Asylum Seekers in Expedited Removal: Volume II: Expert Reports 1, 20 (Feb. 2005), available at https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/evalCredibleFear.pdf.

[17] *Id*. at 28–31.

The risk of erroneous removal is also substantial for individuals who are incompetent due to mental illness or disability.  In traditional removal proceedings conducted before an immigration judge, one of the protections afforded noncitizens who exhibit indicia of mental incompetence is the right to counsel.[18]  But in expedited removal proceedings, no protections, safeguards, or accommodations are provided to noncitizens with mental illness.  The CBP officer does not even conduct competency determinations.[19]

The risk of erroneous deprivation is especially great in this context given that a noncitizen with mental illness or competency issues may not comprehend the nature of the proceedings and may be unable to communicate effectively or answer basic questions about his identity and circumstances.  Such an individual may have enormous difficulty in effectively expressing a fear of persecution or rebutting the charge of inadmissibility.[20]

Beyond assessing the risk of erroneous deprivation, the *Mathews* test also requires us to assess the "probable value,

---

[18] *See Matter of M-A-M-*, 25 I. & N. Dec. 474 (BIA 2011); *Franco-Gonzalez v. Holder*, No. CV 10-02211, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013).

[19] Mayer-Salins, *supra* n.14, at 558.

[20] *See, e.g.*, Renata Robertson, *The Right to Court-Appointed Counsel in Removal Proceedings: An End to Wrongful Detention and Deportation of U.S. Citizens*, 15 Scholar: St. Mary's L. Rev. & Soc. Just. 567, 582 (2013) (discussing the case of Sharon McKnight, a mentally disabled U.S. citizen, who was wrongly removed to Jamaica).

if any, of additional or substitute procedural safeguards."[21] For individuals who fear persecution in their country of origin or who have competence issues, additional procedural safeguards, especially in the form of the right to counsel, would undoubtedly cure many of the ills that plague expedited removals. Counsel would help clients better understand the charges of inadmissibility and rebut those charges based on individualized arguments. Counsel would also advocate for the use of other procedural safeguards, like interpreters, that are too often denied. Counsel would help discover errors in prior removals, which could have a significant impact on a noncitizen's status or the expedited removal. Simply put, the right to counsel would help ensure that people are not wrongfully removed to their countries of origin to face persecution or death. To me, the probable value of additional safeguards is significant.

### c.  Government interest

Certainly, allowing lawyers to represent noncitizens in expedited removal proceedings would impose an efficiency cost on the government. However, the government already allows for legal representation in another type of expedited removal under 8 U.S.C. § 1228(b)(4)(B). Thus, the efficiency cost of allowing counsel to participate in expedited removal proceedings does not appear to be prohibitive. More importantly, cost considerations should not have a significant role in determining whether legal counsel should be allowed when lives and fundamental interests are at stake. It is hard to believe that, today, we are willing to pay such a high human price for administrative efficiency.

---

[21] 424 U.S. at 335.

## III.    Conclusion

The expedited removal system is flawed; it does not account for the realities of immigration and the strong ties to this country held by many noncitizens.  The system is also cruel; it gambles with the lives of hundreds of thousands of people per year by offering few procedural safeguards.  We can, and should, do better.[22]  I would hold that there is a due process right to counsel in expedited removal proceedings.

---

[22] *See United States v. Otherson*, 637 F.2d 1276, 1285 (9th Cir. 1980) (Pregerson, J., Ferguson, J., Norris, J.) ("The message of this case is clear. So long as the American flag flies over the United States courthouses, the federal courts and the federal justice system stand as bulwarks to assure that every human being within the jurisdiction of the United States shall be treated humanely and dealt with in accordance with due process of law by those entrusted with the power to enforce the law.").